## Isaac Straw and James Woods, trading as Straw & Woods, to use of H. B. Powell, trustee, and Enoch L. Straw, Appellants, *v.* Murray, Dougal & Company, Limited.

*Contract—Privity.*

Where A agrees to sell logs to B and B subsequently agrees to sell them to C the obligation of C to pay B for the logs imposes no obligation on C to A.

*Limited partnership associations under act of 1874—Authority of treasurer —Contracts—Checks.*

Recovery cannot be had against a limited partnership association organized under the Act of June 2, 1874, P. L. 271, on checks issued by the treasurer of the association, where it appears that he had no authority to issue the checks; that his act was not subsequently ratified; that the effect of the issuance of the checks was to create a liability against the company new and different from the contract in pursuance of which the checks were alleged to have been given, and the checks, although indorsed by the payees, had never in fact been delivered to them. but had been returned to the association and destroyed.

Argued May 25, 1897. Appeal, No. 198, Jan. T., 1897, by plaintiffs, from judgment of C. P. Northumberland Co., Sept. T., 1896, No. 417, on verdict for defendant. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and DEAN, JJ. Affirmed.

Assumpsit on two checks. Before SAVIDGE, P. J.

The facts appear by the opinion of the Supreme Court, and by the charge of the court below which is as follows:

The defendant in this case is a limited partnership association, organized and doing business under the act of June 2, 1874, and its supplements. Their place of business is Milton, this county. During the logging season of 1890 and 1891, Straw & Woods undertook to deliver upon the banks of Chest creek,

in Clearfield county, a large quantity of white oak, rock oak, white pine, hemlock, beech and other hard wood logs to one W. H. Stevenson. Stevenson was to pay a certain portion of the contract price when the logs were scaled, and a certain other portion when they were banked on said stream, and the balance when they were broken into the stream for the spring drive of 1891; 300,000 feet or more, of the logs, were delivered upon the banks of the stream according to the contract, and in the early part of March, 1891, were ready to be broken into the stream when the spring drive came along. The contract on Stevenson's part had been but partially complied with, as I recollect the testimony, only that portion of the purchase money due when the logs were scaled having been paid, and at this time, Stevenson was largely indebted to Straw & Woods on account of the contract.

Stevenson, on March 23, 1891, contracted to sell to the defendant the white oak logs then on the banks of Chest creek, and still in the possession of Straw & Woods. The contract is in writing properly executed by both parties. The logs were to become the property of the defendant on the signing of the contract. They were to be delivered out of the West Branch Boom at Williamsport, during the season of 1891. The quantity of white oak contracted for by the defendant was 300,000 feet. The logs were to be paid for by the defendant's note for $2,000, at four months, when the logs were broken into the creek, the balance to be paid in note at four months flat when the logs should be rafted out of said boom and accepted by said Murray, Dougal & Co., Limited. It seems there was difficulty in securing the possession of these logs from Straw & Woods, they having refused to break them into the creek until they were paid, or payment secured to them by Stevenson. Stevenson induced Murray, Dougal & Co., Limited, to execute two checks, each for $1,000, dated March 23, 1891, being the date of the agreement between him and the defendant, payable to the order of Straw & Woods. Armed with these checks he went to Westover, Clearfield county, near where these logs were banked, and made use of the checks, as we are bound to assume, because there is evidence to that effect, and it might be so found by the jury, for the purpose of inducing Straw & Woods to break these logs into the stream. Both checks were indorsed "Straw & Woods,

per Woods." Check No. 1, was by Stevenson and Woods left with a justice of the peace, by the name of Fry at Westover, to be cashed, and the proceeds either delivered to Straw & Woods or applied to certain uses for their benefit, when the one half of the said logs were broken into said stream. The possession of check No. 2 was retained by Stevenson, with the understanding that it was to be delivered to Fry, for Straw & Woods, when the other half of the logs should be broken in. Differences arose between Straw & Woods, the members of this firm, resulting in a bill in equity filed in the Clearfield county court, the object of which was to restrain the collection of these checks by Woods. Up to this time about one half of the logs had been broken into the stream. Upon this bill being served operation ceased, and check No. 2, was returned by Stevenson to Murray, Dougal & Co., Limited. On April 1, 1891, Stevenson, Straw & Woods came together at Clearfield, in the office of Murray & Gordon, attorneys, and adjusted their differences by written agreement. In the meantime Woods had telegraphed and written Murray, Dougal & Co., Limited, stopping payment on the checks. By the terms of that agreement these checks were assigned one to H. B. Powell for certain purposes, and the other to Enoch I. Straw, the use plaintiff in this action. It was provided that the check called No. 2, which had at that time been returned to Murray, Dougal & Co., Limited, should be by them returned to Isaac Straw, and it was agreed that Stevenson should give an order on Murray, Dougal & Co., Limited, for that purpose. Check No. 1, which was then in the hands of Fry, was to go to Powell. One of the members of the firm of Murray, Dougal & Co., Limited, Mr. Kramer, was present when this agreement was entered into, and heard the agreement read, but refused to be a party to it, or to bind the defendant by it, or to have any thing to do with it. There was, however, a notice served upon Mr. Kramer to return to Isaac Straw the check No. 2, then in the hands of Murray, Dougal & Co., Limited. The next day Isaac Straw and Stevenson and Kramer, went to Westover, and Stevenson and Straw directed Fry, who held check No. 1, to return the check to Murray, Dougal & Co., Limited, which he refused to do until it should be agreed to by Woods, the other member of the firm. Subsequently Woods joined in the order and the check was returned to Murray, Dougal & Co., Limited.

It is contended, and there is evidence to the effect, that before the check had left Fry's hands Straw countermanded the order, and you may assume for the purposes of this case, because it will be your duty, if warranted in so finding, that at the time Fry returned the check he had forgotten that Straw had changed his mind and countermanded the order. It is contended, and there is evidence to the effect, that at the time Straw and Stevenson consented to the return of this check in Fry's hands, Kramer promised that Murray, Dougal & Co., Limited, would send other checks in its stead. Kramer then went with Shaw to the place where these logs were, and looked them over and made inquiry as to whether they could be all broken into the stream for the then passing drive : Straw responded in the affirmative, and the logs were soon after broken into the stream. Upon the receipt of the checks Murray, Dougal & Co., Limited, destroyed them. Shortly afterwards they paid Stevenson on account $500.

A claim to these logs was then made by a party by name of Kramer, of Lock Haven, to whom it appears they had been subsequently sold by Stevenson, and into whose possession they came. Murray, Dougal & Co., Limited, was obliged to bring replevin for them. The outcome of this litigation was to give Murray, Dougal & Co., Limited, the white oak logs, 123,146 feet, worth at the place of contractual delivery between $1,300 and $1,400. Deducting from this sum the costs to the defendant in litigation, in securing the delivery of the logs, together with the boomage and the $500 paid Stevenson on account of them, there appears to be, as between Stevenson and the defendant, very little due, no more than $200 or $300, at most.

Straw & Woods have nothing for their logs, except the few hundred dollars paid for them at the time they were scaled. That portion of them bought by Murray, Dougal & Co., Limited, and which came in their possession thus far, cost them also, all they were worth, and nobody seems to have profited by the transaction, unless it be the Lock Haven Kramer, who seems to have taken the advantage in some way of both parties. This man got all the logs, except the white oak logs, and made it cost Murray, Dougal & Co., Limited, half of what the white oak logs were worth to obtain possession of these.

[This suit is brought upon the checks, counsel for the plain-

tiffs claiming in no other way. They frankly state to the court, that unless entitled to recover upon the checks, they have no cause of action under the pleadings. These checks were signed by C. H. Dickerman, treasurer of Murray, Dougal & Co., Limited. They were not signed by two managers as required by the act of May 10, 1889, supplemental to the act of 1874. That act provides that " no debt shall be contracted or liability incurred for said association, except by one or more of the said managers, and no liability for an amount exceeding $500, except against the person incurring it, shall bind the said association, unless reduced to writing and signed by at least two managers." It is contended by the plaintiffs that these checks created no new liability, and, inasmuch as the contract of March 23, was properly executed, and these checks, as they contend, given in payment or part payment of the consideration money of that contract, it was not necessary that they be signed by two managers.

If I could come to the conclusion that these checks did not create a new liability I would feel that I would have to submit the case to you for your determination. But I am of opinion that the checks did create a new liability on the part of Murray, Dougal & Co., Limited ; that their effect was to so change the contract of March 23, as to make it a different undertaking on the part of the defendant. By that contract the $2,000 was to be paid by note at four months. It was not to be paid until the logs were broken into the creek. The logs as per the contract between Straw & Woods and Stevenson, were not to become the property of Stevenson until they were broken into the creek.

These checks when delivered to Straw & Woods would create a liability on the part of Murray, Dougal & Co., Limited, to pay them without regard to the possession of the logs in question, or without regard to whether they might ever come into the possession of Murray, Dougal & Co., Limited, whereas by the contract of March 23, Murray, Dougal & Co., Limited, were not even to execute and deliver the notes until the logs were actually in the stream. By the checks, had they been so executed or so issued by Murray, Dougal & Co., Limited, as to bind them, they would have been liable for the property that might never have got beyond the possession of Straw & Woods,

where these logs actually were at the time the checks were given. It seems to me, therefore, as I said before, that these checks did create a new and different liability from that created by the contract of March 23. Therefore, I am of the opinion that Murray, Dougal & Co., Limited, was not bound by the act of C. H. Dickerman, treasurer, in issuing the checks, although it may be that Mr. Dickerman made himself personally liable.] [4]

[It is contended by the plaintiffs that there was a ratification by the defendant through the act of its manager in this way; that what Mr. Kramer did at Westover, and especially afterwards, when upon the grounds where the logs were, induced the plaintiffs to break the logs into the stream upon the faith of the checks. I do not think that his acts could be so construed, nor had he the power to bind the company by anything he might have done there.

Principally for this reason, gentlemen, I have concluded there can be no recovery by the plaintiffs in this action.] [5]

Verdict and judgment for defendant. Plaintiffs appealed.

*Errors assigned* were (4, 5) above instructions, quoting them.

*Harry S. Knight* and *George B. Reimensnyder*, for appellants, cited Stedman v. Carstairs, 97 Pa. 237 ; Potter v. Beacon Construction Co., 154 Pa. 8.

*C. LaRue Munson* and *W. H. Hackenberg*, with them *Addison Candor*, for appellee, cited Pittsburg Melting Co. v. Reese, 118 Pa. 355 ; Mercantile Nat. Bank v. Lauth, 143 Pa. 53 ; Walker v. Keystone Brewing Co., 131 Pa. 546.

OPINION BY .MR. JUSTICE McCOLLUM, October 11, 1897 :

There was no contract, verbal or written, between the plaintiffs and the defendant company for the sale and delivery of logs by the former to the latter, but the plaintiffs had a written contract with Stevenson by which they agreed to sell and deliver logs to him on the terms stated therein, and he had a written contract with the defendant company by which he sold to it, "to be delivered out of the West Branch Boom during the sea-

son of 1891," the logs the plaintiffs had agreed to sell and deliver to him. The plaintiffs' contract with Stevenson was entered into on August 2, 1890, and his contract with the defendant company on March 23, 1891. At or about the time appointed by the contract between the plaintiffs and Stevenson for the delivery of the logs, there was a disagreement between the plaintiffs which resulted in a suit that terminated in a settlement on April 1, 1891, which settlement was reduced to writing and signed by Straw, Woods and Stevenson. The defendant company had no connection with the settlement and was not in anywise affected by it. In its contract with Stevenson it had agreed to pay him for the logs $11.50 per thousand feet, free of boomage, as follows : Two thousand dollars ($2,000) in its notes at four months when the logs were broken into the creek and the balance to be paid in its notes at four months flat, when they had all been rafted out of the West Branch Boom, and accepted by it. Assuming that this contract created a liability which the company was bound to discharge in accordance with its terms it furnishes no ground for a recovery in this suit.

The liability imposed by the contract is not to the plaintiffs but to Stevenson who has not surrendered any of his rights under it to them. It appears that Stevenson, after the execution of the contract, induced the treasurer of the defendant company to draw and deliver to him two checks of $1,000 each, on the First National Bank of Milton, payable to Straw & Woods or their order. It nowhere appears in the evidence that there was any formal or other authorization by the company of the issuance of these checks or of a ratification of it. If they were intended as payments on the company's contract with Stevenson, or as payments on account of the plaintiffs' contract with him, it can hardly be contended that the treasurer by virtue of his office was authorized to issue them. If such a power inheres in or is incident to his office he may of his own volition materially change the provisions of the company's contracts, defining its liabilities and the manner of discharging them, and create liabilities which the company must discharge, and for which no consideration has been received or bargained for. It is quite certain that no such power is vested in any officer or member of a partnership association organized under

the act of June 2, 1874, and the supplements thereto. The maintenance, therefore, by the plaintiffs of their suit on the checks required the production of evidence showing authorization or ratification by the company of the issuance of them. The plaintiffs recognizing the importance of this, sought to show ratification by the company, predicated on Kramer's presence when the settlement of April first was made, and when some of the logs were broken into the creek. Their offer to establish ratification was a failure. Kramer distinctly refused to have anything to do with the settlement, and the undisputed evidence is that he declared at the time of it that the checks would not be paid. In his presence at the creek when some of the logs were broken into it, there was no element of ratification; nor can we find from the evidence that anything was said or done by him there or elsewhere which estopped the company from denying its liability upon the checks. Besides, it was not shown that he was clothed with authority to obligate the company to pay them. The matters to which we have referred are, considered by themselves, sufficient to warrant the action of the court in instructing the jury to find for the defendants. Aside from these, however, there are other matters which deserve notice. The checks were not delivered to Straw & Woods, although they indorsed them. Stevenson returned one of them to the defendant company, and it was destroyed, and he placed the other in the custody of Fry, who by direction of Straw, Woods and Stevenson sent it to the company, and it was also destroyed. It is true that Woods testified that he once had possession of the check Stevenson lodged with Fry, and that Straw testified that he said to Fry, after he directed the check to be sent as above stated, that he (Fry) had better keep the check until he (Straw) heard from his attorneys. But this testimony cannot be regarded as nullifying the surrender of the checks or establishing fraud on the part of Fry or the company in connection with it. The checks were surrendered and destroyed early in April, 1891, and this suit was brought on July 30, 1896. In the meantime the defendant company has, after a protracted and costly litigation with Stevenson, Kramer and the West Branch Boom Company, recovered less than one half of the logs called for by its contract with Stevenson.

It has paid on the contract with Stevenson an amount which, together with the expenses of the litigation forced by Stevenson and his confederates, equals four fifths of the price it agreed to pay for the logs. It will thus be seen that the equity as well as the law accords with the judgment entered by the court below.

The specifications of error are overruled.

Judgment affirmed.